HAMID HEKMATIAN
7250 E. PARADISE DR.
SCOTTSDALE, AZ 85260
(480) 371 - 8852

FILED _____ LODGED
RECEIVED _____ COPY

NOV 2 8 2012

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ Z DEPUTY

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| HAMID HEKMATIAN, an individual )<br><br>Plaintiff, )<br><br>vs. )<br><br>KENNETH A. JACKSON, an individual, )<br>WILLIAM SCHURECK, an individual, )<br>MARCO S. BURNETTE, an individual, )<br>RICHARD VAN HORN, an individual, )<br>ALBERT S. MILLER, an individual, and )<br>MEDICAL SAFETY SOLUTIONS, INC., a )<br>Nevada corporation, and nominal defendant )<br>with respect to the derivative claims, )<br><br>Defendants. ) | CV-12-02534-PHX-MHB<br><br>Case No. _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR
## INJUNCTIVE RELIEF AND DAMAGES

As and for their Complaint for Injunctive Relief and Damages (the "Complaint") against

Defendants Kenneth A. Jackson ("Jackson"), William Schureck ("Schureck"), Marco S. Burnette

("Burnette"), Richard Van Horn ("Van Horn"), Albert S. Miller ("Miller"), and Medical Safety

Solutions, Inc. ("MSS") (collectively, the "Defendants"), Plaintiff Hamid Hekmatian states and

alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for, among other things, federal securities fraud, common law fraud, breach of fiduciary duties, fraudulent inducement, breach of contract, and injunctive relief. As stated with great detail herein, the Plaintiff's claims arise out of, among other things, Defendants' false and fraudulent misrepresentations made to the Plaintiffs regarding MSS's Sharps Terminator® ("Sharps Terminator"), including without limitation, with respect to the time frame within which clearance by the Food and Drug Administration ("FDA") would be obtained, to induce Plaintiff to (a)  invest $37,500 to purchase MSS shares, (b) enter into a distributorship relationship with MSS relating to the Sharps Terminator, which MSS has breached, (c) enter into a manufacturing relationship with MSS relating to the Sharps Terminator, which MSS has breached, and (d) expend more than $20,0000 in connection with the set up, training  and marketing the Sharps Terminator.

2.      In addition to the false representations regarding FDA clearance, in order to induce the Plaintiff to invest in MSS, the Defendants knowingly and falsely represented that the Sharps Terminator was a completed and commercially viable product that was capable of being produced in large quantities.  As part of their fraudulent scheme to induce the Plaintiff to purchase MSS shares, the Defendants also repeatedly misrepresented the true nature of the position held by Jackson within MSS, claiming that he was only the Director of Research & Development, when in fact, he was responsible for making all substantive decisions concerning MSS and the Sharps Terminator, regardless of whether such decisions were related to research and development.

3.      Indeed, Plaintiff recently discovered that Jackson's true involvement and lack of officer or director title was part of the Defendants' scheme because Jackson is a convicted felon, who in 1994 was convicted of 117 counts of securities violations, theft, perjury, and passing bad

2

checks.  *See, e.g.,* Ohio Securities Bulletin, Issue 94:3, p. 9, *available at* http://www.com.ohio.gov/secu/docs/BUL943.pdf (last accessed Nov. 18, 2012).  Prior to that conviction, Jackson had been enjoined in 1991 from violating federal securities laws in a civil action brought by the Securities and Exchange Commission ("SEC").  *See* SEC News Digest, Issue 91-54, pp. 1-2, *available at* http://www.sec.gov/news/digest/1991/dig032091.pdf (last accessed Nov. 18, 2012).

4.      Because of the Defendants' fraudulent conduct, including without limitation, their intentional failure to take the necessary steps to obtain the required FDA clearance in a timely manner, and their failure to deliver a commercially viable product as represented, the Plaintiff has been unable to sell the Sharps Terminator in the United States, thus rendering the distributorship agreements worthless.

5.      In addition, the Defendants, including without limitation, through Jackson, further induced investors other than the Plaintiff, continue to induce others, and unless enjoined and restrained, will continue to fraudulently induce others, to purchase shares of MSS based on false representations regarding (a) the time frame in which FDA clearance of the Sharps Terminator will be obtained and (b) the capabilities and commercial viability of the Sharps Terminator as detailed below.

6.      Unless restrained and enjoined, the Defendants' fraudulent actions in violations of the securities laws and in derogation of their fiduciary duties will continue to expose MSS to liability and thus, harm the value of the company's shares and its shareholders. As such, through this action, the Plaintiff seeks, among other things, (i) compensatory and punitive damages, with interest and attorney's fees, (ii) the appointment of a temporary receiver over the Defendants' assets, (iii) to protect investor funds, a freeze over each of the Defendants' assets, (iv) an

accounting of each of Schureck's, Jackson's, and MSS's assets, and (v) preliminary and permanent injunctive relief against each of the Defendants prohibiting any further violations of the federal securities or other laws and any further breaches of fiduciary duties.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act ("Exchange Act") (15 U.S.C. § 78j(b) and § 78t(a), respectively) and Rule 10b-5 promulgated thereunder (17 C.F.R § 240.10b-5).

8.      This Court has original jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction to hear and determine the Plaintiff's state and common law claims pursuant to 28 U.S.C. § 1367.

9.      Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1391(b) and (c).  Many of the acts, practices, and courses of conduct constituting violations of the federal securities laws as alleged herein, including the communication and dissemination of materially false and misleading information, occurred in substantial part in this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails and interstate telephone communications.

## PARTIES

11.     Plaintiff Hamid Hekmatian is an individual and an Arizona citizen.  At all times relevant to this Complaint, Hekmatian purchased and held shares of MSS stock.  Hekmatian owns 50,000 Class A MSS Preferred Shares, (purchased November 4th 2008 for $25,000) and

25,000 shares of MSS common stock (purchased Sept 17th 2010 for $12,500), all of which he purchased from MSS.

12.     Plaintiff Hamid Hekmatian is also representing Sharps Medical Solutions, a limited liability company he formed with Seyed Paransun, who is no longer with the company. In the Southwest Master Distribution Agreement (hereafter referred to as MDA) (attached hereto as Exhibit C), Sharps Medical Solutions is identified as the exclusive distributor of the Southwest territory for sale and distribution of the Sharps Terminator.

13.     Defendant Kenneth A. Jackson is a resident and, upon information and belief, a citizen of Ohio.  Jackson is the inventor of the Sharps Terminator.  (*See* "Key Management" section of document entitled "Medical Safety Solutions, Inc. – Sharps Terminator™" ("MSS Prospectus I"), attached hereto as Exhibit A, and p. I-2 of document entitled "Medical Safety Solutions – Cutting Edge Technologies" ("MSS Prospectus II"), attached hereto as Exhibit B.) Jackson also invented the Geovolt, a product that, upon information and belief, also is produced and/or sold by MSS or an entity owned or affiliated with MSS.  At all times relevant to this Complaint, Jackson identified himself, and was identified in various MSS offering materials, as the Director of Research and Development for MSS.  (*Id.*)  In fact, Jackson had far greater responsibilities within MSS and was responsible for making all substantive decisions regarding the company, including without limitation, whether and when to seek and obtain FDA clearance for the Sharps Terminator.

14.     Defendant Medical Safety Solutions, Inc. is a Nevada corporation established by the Defendants with its principal place of business in Mansfield, Ohio.  MSS is a citizen of Ohio.

15.     Defendant William Schureck is a resident and, upon information and belief, a citizen of Ohio.  At all times relevant to this Complaint, Schureck served as the chief executive

officer ("CEO") of MSS.  He identified himself, and was identified in various MSS offering materials, as the "co-founder of the company . . . familiar with all aspects of the operations and [he] has been instrumental in bringing the company from inception to the marketplace."  (MSS Prospectus II, p. I-2; MSS Prospectus I, "Board of Directors.")

16.      Defendant Marco S. Burnette is an individual and, upon information and belief, a citizen of Ohio.  At all times relevant to this Complaint, Burnette served as chairman and secretary to the MSS board of directors in addition to being described in MSS's offering as a "a major investor in the company" who "served 28 years as Superintendent for Manchester Local Schools in Akron Ohio."  The offering materials further describe him as having been "employed by Merrill Lynch, Pierce, Fenner & Smith for six years and served as Division Head of OTC Trading."  (MSS Prospectus II, p. I-6; MSS Prospectus I, "Board of Directors.")

17.      Defendant Richard Van Horn is an individual and, upon information and belief, a citizen of Ohio.  At all times relevant to this Complaint, Van Horn served as chairman and treasurer to the MSS board of directors in addition to being described in MSS's offering materials as (a) a "the accountant for an Ohio nursing home group with $250 million in annual sales and a regional restaurant company with over $100 million in annual sales" and (b) a CPA with "extensive experience providing tax services to public and private businesses."  (*Id.*)

18.      Defendant Albert S. Miller, M.D. is an individual and, upon information and belief, a citizen of Alabama.  At all times relevant to this Complaint, Miller was a major shareholder and member of the MSS board of directors with "extensive experience in Family Practice and Emergency Medicine."  (MSS Prospectus II, p. I-7; MSS Prospectus I, "Board of Directors.")

## GENERAL ALLEGATIONS

19.      The Defendants formed MSS for the purpose of "developing, licensing,

manufacturing, and distributing its proprietary products," one of which is the Sharps Terminator.

(*See* Ex. A, § 1.0, Executive Summary.)

20.     The Sharps Terminator is described in MSS Prospectus II as follows:

> The Sharps Terminator™ device is currently the main product for the company.  See appendix for an overview of products currently under development at MSS research and development.
>
> The Sharps Terminator™ swiftly and safely destroys a wide range of disposable needles – from IV to butterfly, 16-gauge to diabetic. Simply insert the needle into the Sharps Terminator™, and a pulse of electrical energy reduces the needle to harmless ash, with any remaining metal removed from the syringe and exposed to germicidal UV light.  In seconds, both the needle *and* the risk are eliminated—**no sharps container required.**
>
> Capable of destroying up to 500 standard needles on a single battery charge, the Sharps Terminator™ is compact (under 7" tall), portable (less than 4lbs), and completely mobile.
>
> Expected to retail in the U.S. for $799, the Sharps Terminator™ is an OSHA-compliant alternative to safety syringes, paying for itself in as few as 1,600 uses – or the prevention of just one (1) needle-stick, where testing and treatment average can approach $3,000 or more $3,000 per incident and much more in cases of HIV infection.

(Ex. B, p. II-2.)

21.     Purportedly to obtain funding for "manufacturing, inventory and marketing efforts targeted by MSS" (*id.*) and other undisclosed purposes, MSS, primarily through Jackson, Schureck and the prospectuses attached hereto, sought investors to purchase various classes and shares of the company.

22.     The various types of shares investors could purchase were Class A Preferred Shares, Class B Preferred Shares, other Series Preferred Stock (if authorized), and common stock. (*See* prospectus entitled "Medical Safety Solutions, Inc. – Sharps Terminator™" ("MSS Prospectus I") and Parts IX and XII, pp. XII-10-XII-12, of the prospectus entitled "Medical Safety Solutions – Cutting Edge Technologies" ("MSS Prospectus II"), relevant portions of

which are attached hereto as Exhibits A and B, respectively).

23.     Class A Preferred Shares were initially offered pursuant to MSS Prospectus I, while MSS Prospectus II marked the beginning of MSS's sales of Class B Preferred Shares.

24.     As described more fully below, early in MSS's capital raising efforts, purchasers of Class A Preferred Shares were allowed to become distributors of the Sharps Terminator pursuant to a "Master Distributor Agreement" ("MDA") for various regions of the United States. MSS later created a new class of shares for those investors who wanted to enter into a MDA. The shareholders who were parties to the MDAs were also required to place an initial order for and pay for (*i.e.*, pre-order) 5,000 Sharps Terminator units "within 90 days of the availability of a commercially ready device," to purchase 10,000 units total within 12 months after FDA clearance, and to purchase increasing amounts of units each year until a yearly quota of 40,000 units is in place for years three through fifteen. (*See* Master Distributor Agreement – Southwest United States, p. 3, ¶ 4, attached hereto as Exhibit C.)  All MDAs contained the same or substantially similar requirements.

25.     According to MSS Prospectus II, MSS would offer owners of Class B Preferred Shares "a $20 royalty override on the first 500,000 units sold to repay investors two (2) times their initial investment," with such proceeds to "help fund manufacturing, inventory and marketing efforts targeted by MSS." (MSS Prospectus II, p. II-3.)

## Misrepresentations Contained Within Offering Materials

26.     The Plaintiff received certain offering materials from MSS before deciding whether to purchase MSS shares. Among other materials, Hekmatian received MSS Prospectus I and MSS Prospectus II from MSS.

27.     The offering materials contain numerous material misrepresentations that Plaintiff relied upon in deciding to purchase their MSS shares.

28.     For example, through MSS Prospectus II, Jackson, Schureck, and MSS represented that the Sharps Terminator "is now in the final stages of FDA clearance." Jackson, Schureck, and MSS knew that statement was false when they made it or caused MSS to make it.

29.     Indeed, Hekmatian purchased MSS common stocks to pay for 100 prepaid units. MSS, through MSS Prospectus II, still represents that the Sharps Terminator "is now in the final stages of FDA clearance."

30.     In fact, the product had not been cleared at the time Hekmatian purchased his shares.  Upon information and belief, the product had not yet been submitted to the FDA for clearance at the time the above statement was placed in MSS Prospectus II.

31.     As of the date of the filing of this Complaint, the Defendants, despite repeated requests from the Plaintiff and other master distributors of the Sharps Terminator, still have not provided any information to the Plaintiff to enable the Plaintiff to verify whether FDA clearance has ever been sought, in what manner, and what stage of the FDA clearance process the Sharps Terminator is in.

32.     In addition, according to the offering materials that the Plaintiff received, the Sharps Terminator could dispose of "All 14 – 30 Gauge Aluminum and Stainless Steel Needles up to 2-inches in Length."  (MSS Prospectus I § 2.2.)

33.     In fact, this was false.  The Sharps Terminator was not able to dispose of needle sizes of 18 gauge without failing, and in fact, still cannot do so.  This was a material misstatement because the gauge size impacts the product's value to the marketplace (and thus the value of MSS's shares) and its distribution prospects.

34.     In addition, the prospectuses are not dated and it is difficult to discern when certain information was added to each.  For example, in one portion of MSS Prospectus II,

9

documents dated in October 2009 can be found.  However, that same prospectus contains financial/sales forecasts for the months of October 2009 forward.  To make matters even more misleading and confusing, the very last document in the prospectus authorizing the Class B Preferred Shares is dated in November 2009.  At the very least, it appears from the financial statements and projections that MSS Prospectus II was created sometime in mid to late-2009 and was last updated sometime in late 2009.

35.    In addition, although MSS Prospectus I contains a form of Asset Purchase Agreement purportedly to transfer the intellectual property behind the Sharps Terminator from Jackson and Schureck Partnership (an Ohio partnership owned by Schureck), neither an executed version of that document nor any intellectual property assignment has never been produced by Defendants despite requests from Plaintiff to do so.

36.    Further, based on the financial information produced as part of MSS Prospectus II, it does not appear that any such transaction ever closed to effect the purported transfer. Indeed, the closing, which was supposed to have occurred within 90 days of the execution of the document, would have triggered the following obligations for MSS:  (1) to pay Jackson and Schureck Partnership $250,000 on the closing date and (2) after the closing, MSS was to pay Jackson and Schureck Partnership $2,750,000 pursuant to the form of promissory note contained within MSS Prospectus I as Exhibit 1.3(a)(iii) to the Asset Purchase Agreement, which called for full payment of the principal amount, with interest, within one year.  Neither the initial payment nor the promissory note (or payments pursuant thereto) are reflected anywhere on the financial documents included with either MSS Prospectus I or MSS Prospectus II, including without limitation on Schedule L (Balance Sheet per Books) to MSS's tax return for the time period of December 1, 2007 through November 30, 2008, which also fails to list any note payable or

deductions or losses attributable to having made payments on such note.

37.     As such, it appears that the shares of MSS, the value of which is almost entirely dependent upon MSS having the right to produce and sell the Sharps Terminator, may well be completely worthless.

### Other Misrepresentations Made Inducing Plaintiff To Purchase MSS Shares

38.     In the third quarter of 2008, and prior to the time he invested in MSS in October 2008, Hekmatian met with Jackson in San Jose, CA, about the Sharps Terminator and MSS. Jackson and described the product to Hekmatian and sent him MSS Prospectus I. At that meeting, Jackson demonstrated a prototype/demonstration Sharps Terminator unit and told Hekmatian and the others present at the meeting that if they purchased Class A Preferred Shares, then they could earn a $300.00 commission for each Sharps Terminator they sold.  Those present at the meeting asked about whether the Sharps Terminator was market ready and about the status of FDA clearance.  Hekmatian and the other potential investors were told that MSS would be able to produce units in volume as of the time FDA clearance was obtained because MSS was securing manufacturing resources, that FDA clearance was "right around the corner," expected to be finalized in a few months, and that the device had been thoroughly tested and was ready for sale.  At the meeting, a form of Master Distributor Agreement was presented to the potential investors.  Jackson told everyone at the meeting that Class A Preferred Shares of MSS stock were being sold for $0.50 per share with a minimum purchase of $10,000.

39.     On November 4th, 2008, in reliance on the above representations made by MSS through Schureck, Jackson and after reviewing MSS Prospectus I, Hekmatian purchased 50,000 Class A Preferred Shares of MSS stock, for which he paid $25,000. On September 17th, 2010, in

reliance on the ongoing representations regarding imminent FDA clearance and product performance, and based on Jackson and Schureck's urgent claim that supply will be limited, and it was necessary to prepay in order to reserve first run of manufacturing, Hekmatian purchased additional shares of MSS stock, this time purchasing 25,000 shares of MSS common stock for $12,500.

40.     On February 7, 2009, MSS arranged a master distributor meeting in Mansfield, Ohio at a warehouse facility that MSS had just acquired, which Plaintiff attended.  Schureck and Jackson assured them that FDA clearance for the Sharps Terminator was expected at any moment.  Schureck and Jackson also informed everyone at the meeting that the final assembly and shipping of the Sharps Terminators would be performed in Mansfield, Ohio.

41.     In December 2009, MSS informed Plaintiff that FDA clearance was expected that month.

42.     On January 9, 2010, the Plaintiff received an email from Jackson outlining the FDA's PDP/PMA process and stating that he and MSS had a call scheduled with the FDA for later in the week, which Jackson expected to result in clearance of the Sharps Terminator.

43.     In May 2010, Plaintiff attended the first meeting of the Master Distributors in Mansfield, Ohio.  They met other Master Distributors (or potential Master Distributors) for the first time.  Commissions, territories, discounts, exclusive rights, and other issues were discussed. At that meeting, Schureck and Jackson informed everyone there that the FDA cleared the Sharps Terminator.  Jackson further showed everyone there a letter with a certificate number on it from the FDA.  At that meeting, Jackson also went into great detail about the FDA filing process and showed Plaintiff and others present what he claimed was a history file that the FDA required regarding each step in the development of the Sharps Terminator.

12

44.     On August 27, 2010, Jackson again stated that the device was market ready and that MSS could produce the device in volumes of 10,000 to 20,000 per month if necessary. Contrary to his prior statement that FDA clearance already had been obtained for the Sharps Terminator, Jackson stated at the August 2010 meeting that FDA clearance would occur very soon, but that the device could be sold in Europe without FDA clearance.

45.     Also in August 2010, in reliance on the above statements made by Jackson and Schureck, Hekmatian entered into agreements with various sub-contractors to market, sell, and distribute the Sharps Terminator. (as evidenced in Exhibit D.)

46.     On September 18, 2010, Hekmatian met with Schureck, Jackson, Eric Davis (who Schureck had said was the Chief Operating Officer of MSS), and the rest of MSS's management in Mansfield, Ohio for a master distributor meeting and training.  At that meeting, Jackson again stated FDA clearance was imminent any day.  During that meeting, Hekmatian and the others in attendance were made aware of two other inventions that Schureck and Jackson stated were under the MSS "company umbrella" – the Geovolt and the Bi-Metal Generator – which inventions would contribute to providing additional dividends to MSS's shareholders.

47.     At some point after August in 2010, another distributor (Atkinson) went to Europe to demonstrate the device for various health ministers and to begin sales in Europe because the device did not need to obtain FDA clearance to be sold in Europe. Atkinson, another master distributor, was given approximately 5 or 7 units to take with him to demonstrate to approximately 13 health ministers during a meeting. At that meeting, all of the units failed within minutes when attempting to process a standard 18 gauge needle.

48.     After hearing about what happened in Europe, Hekmatian had a terse conversation Jackson about his claims regarding the Sharps Terminator's viability and the

13

purportedly rigorous testing of the device. In fact, Hekmatian sent Jackson a lengthy questionnaire asking specifics about the Sharps Terminator. At that point, (European master distributor) Evolutions began to consider re-engineering the device and making it to clinical standards.

49.     After Atkinson's trip to Europe, Hekmatian had several additional conversations with Jackson about the reliability of the device during which Jackson assured Hekmatian that he had made upgrades, that the device was market ready, and that MSS could produce the device in volume.

50.     Atkinson then flew back to Europe with 5-10 supposedly upgraded devices. At that meeting, the devices failed again. Evolutions then began disassembling the devices and found that none of the devices were identical. At that moment, Evolutions began raising funds to re-engineer and build a market ready device.

51.     In early February 2011, Evolutions' heads (Andy LaPointe and Ralph Scumaci) met with Schureck and Eric Davis of MSS, at a hotel in South Holland, Illinois to discuss a possible investment in MSS by LaPointe.

52.     At that meeting, Schureck and Davis told Evolutions that FDA clearance with respect to the Sharps Terminator was imminent within 60 days. They also made the following representation to Evolutions at that meeting:

      (a)   that the Sharps Terminator was market ready;

      (b)   that MSS had a factory in Pennsylvania that was capable of making 20,000 devices a month;

      (c)   that MSS had an energy subsidiary that held patents for two devices with big money potential – the Geovolt and the Bi-Metal Generator – and that profits from these inventions would be paid out as dividends to owners of MSS Class B Preferred Shares;

      (d)   that Schureck was the CEO, Jackson was the inventor and Director of R&D,

and Eric Davis was the COO;

(e) that MSS had already sold 1,000 devices both as US demo devices and to foreign companies;

(f) that Jackson patented the Sharps Terminator and that Jackson assigned the patent to MSS;

(g) that MSS was selling Class B Preferred Shares for $5.00 per share and that, once MSS took the stock public, it would immediately be worth $20.00 per share;

(h) that Jackson would meet LaPointe in person and show him any paperwork that he needed to see.

53.     All of these contentions that were made by MSS were similarly relayed to plaintiff.

54.     On the same day, after the meeting at MSS's office, LaPointe went to Jackson's home in Wooster, Ohio and met with Jackson, Donohue, and Denny DiCancio.  Jackson's home also served as MSS's research and development facility.  At that meeting, Jackson told LaPointe the following:

(a) The FDA clearance for the Sharps Terminator was imminent within 30 - 60 days;

(b) The Sharps Terminator was market ready and that MSS had a factory in Pennsylvania that was capable of making 20,000 devices a month;

(c) Jackson gave a detailed description of the Sharps Terminator parts supply chain and the way that he had vetted and tested the suppliers and their products;

(d) Jackson gave an in depth description of the testing and quality control processes that he used to vet the Sharps Terminator and make sure that it was market ready;

(e) MSS had an energy subsidiary that held patents for two devices with big money potential – the Geovolt and the Bi-Metal Generator.  LaPointe was shown prototypes of these products in the R&D shed;

(f) Profits from these inventions would be paid out as dividends to MSS Class B shareholders;

15

    (g)   Bill Schureck was the CEO, Jackson was the inventor and Director of R&D, Dane Donohue was responsible for FDA clearance;

    (h)   That Jackson patented the Sharps Terminator and that Jackson assigned the patent to MSS; and

    (i)   That MSS was selling Class B shares for $5.00/share and that, once MSS took the stock public, it would immediately be worth $20/share.

55.    All of these representations were similarly relayed to Plaintiff.

56.    At that meeting at Jackson's home, and at all subsequent meetings, it was clear that Jackson was the true decision maker with respect to MSS. For example, he discussed himself (as opposed to MSS, Schureck, or anyone else at MSS) as "giving Evolutions the Midwest U.S. Master Distributorship" if LaPointe paid the $100,000 according to the terms previously discussed. Jackson also detailed at length the distributorships that *he* had sold around the world and in the US. He let LaPointe know that if LaPointe did not act fast, Kentucky might not be available as part of the Midwest Region.

57.    Jackson provided Plaintiff and other shareholders with a detailed description of the FDA clearing process. Jackson claimed that he had submitted a Product Development Protocol "PDP" filing with respect to the Sharps Terminator as a Class III medical device.

58.    Jackson also claimed that his finishing factory in Mansfield, OH had been audited by FDA examiners in 2010, that he had fully passed FDA inspection, and that the FDA would have a clearance letter out to him "any day now." Jackson went into great detail describing the steps he undertook to satisfy the FDA examiners, that the examiners left satisfied, and that the FDA had no final objections.

59.    After entering into master distribution agreements, Plaintiff and other distributors continued efforts to raise money to sell and distribute the Sharps Terminator. During the course

16

of all of the Plaintiff's activities, he was repeatedly told by Jackson and Schureck that FDA clearance for the Sharps Terminator was only 30 to 60 days away and that he would be allowed to distribute and sell the product in the United States soon after such clearance was obtained.

60.     In addition to the meetings above, the Plaintiff met or spoke with Jackson and Schureck several other times during 2011. As a further inducement to keep Plaintiff as an investor in, distributors for, and manufacturers for, MSS, during nearly all of those meetings and conversations, they were told of other patents and devices that supposedly were all part of the Plaintiff's MSS stock holdings, including without limitation, the Geovolt and the Bi-Metal Generator.

61.     The Defendants knew the representations detailed above were false when they were made. As an example demonstrating the Defendants' knowledge of such falsity, through the Plaintiff's interactions with Interactive Engineering Corp. ("IEC," the company that made the circuit boards for Jackson's/MSS's non-working device) subsequent to February 2011, they learned that IEC claimed to have been working with Jackson since 2010 to correct terminal overheating and crashing issues in the Sharps Terminator electrical systems. This was a major problem with respect to the Sharps Terminator. Indeed, Jackson and MSS very aware that the devices failed nearly 100% of the time if used as marketed for any substantial time.

62.     In addition, through the Plaintiff's interactions after February 2011 with those who had purchased the Sharps Terminator prior to February 2011, Plaintiff again learned that the failure rate for the devices was almost 100%. Plaintiff learned that all of those customers had reported to Jackson and MSS that their Sharps Terminator had failed, and had requested a replacement. Thus, Jackson and MSS were well aware that the Sharps Terminator electrical systems had terminal flaws before February 2011.

63.     Neither Jackson nor MSS disclosed these issues or that the Sharps Terminator did not work as marketed at any point prior to Evolutions finding out this information on its own. When the Plaintiff initially learned this information, he believed that Jackson, Schureck, and MSS were simply incompetent.

64.     In furtherance of its misrepresentations and fraudulent scheme, for the past several years, MSS has failed and refused to send any meaningful written correspondence to shareholders and master distributors.   MSS officers and directors rarely respond to calls or emails from shareholders.   The terse and limited communications that have been sent were poorly written and contained information that is impossible to verify.

65.     For example, in a letter dated May 25th 2011, Schureck informed shareholders that MSS was cleared by the FDA to market the Sharps Terminator in the United States.   He even provided a purported PDP clearance number, , which the Plaintiff has been unable to verify

"May  25,2011

To All Concerned,

Today, we received our PDP clearance number to manufacture and market the Sharps Terminator™ in the US market.  This is a long awaited milestone in the building of Medical Safety Solutions and we are now taking immediate steps to launch the product on a world-wide basis.  The PDP number assigned to the product is **PD073601/234**. We will be making a public announcement soon. We appreciate everyone's support during this long process which is now behind us.

Bill Schureck CEO
Ken Jackson Director of R&D
And the MSS Staff"

as a true and accurate number, despite the fact that MSS represented in prior correspondence in 2010 that such clearance would be posted on the FDA website when received.

66.     In addition, despite having little or no sales, in a letter dated January 24, 2012, MSS informed owners of certain Preferred Shares that they were making a distribution, or in

18

some cases, enclosing a check, and that additional distributions would be made each month at least through April 2012. The Plaintiff received a one-time hand written check for $500. This was another act of deception by MSS to tell the stockholders that there is money and income in the corporation.

### Jackson Orchestrates Further Falsehoods Regarding FDA Clearance

67.     In early 2012, Evolutions, another master distributor (European, Midwest U.S. territories,) successfully re-engineered and manufactured a first-class, market ready Sharps Terminator device. The device manufactured by Evolutions passed all of the testing requirements and acquired the CE marking in Europe. All of the technical data Evolutions had generated in re-engineering the product to work was provided to Jackson so that he could submit it to the FDA to supplement what purportedly was an existing FDA filing.

68.     Jackson first told Evolutions that he would do so in May 2012. On July 2, 2012, Jackson sent an email, stating that the FDA filing had been made. Jackson said that he would email Evolutions members the tracking number for the package by the end of that day, which he never did.

69.     On July 3, 2012, Atkinson (master distributor, employee of Evolutions) drove to Mansfield, Ohio to determine the true status of the FDA filing. Atkinson discovered that Jackson had lied and that the filing had not been sent. Jackson refused to provide Atkinson with any FDA filing information.

70.     Nevertheless, at a meeting with all of the Master Distributors in July 2012, the Plaintiff and other distributors were told by Jackson yet again that FDA clearance of the Sharps Terminator would be obtained within 30 days.

71.     From July through September 2012, Jackson and others at MSS continued to tell the Plaintiff and other master distributors that the filing would be completed by Jackson, but it

was not.  It was not until on or around October 23, 2012 that Jackson finally provided the Plaintiff with a copy of what purported to be a FDA filing to review, together with a confirmation purportedly from the FDA that a filing had been received.

72.     However, the purported FDA confirmation letter assigned the filing a PMA number as opposed to a PDP number.  Jackson had previously told all of the shareholders that the filing for the Sharps Terminator was a PDP filing.  Further, a search of the PMA applications on the FDA's website provides no results for any PMA applications by MSS or associated with any device known as the Sharps Terminator.

73.     Further, Jackson's claims of his finishing facility in Mansfield, OH having been inspected and approved by FDA examiners in 2010, there is no record of an inspection of Medical Safety Solutions, Sharps Terminator or Ken Jackson in the inspection database at the FDA website.

74.     As of the date of this Complaint, the Plaintiff still has no clear information regarding FDA clearance of the Sharps Terminator, although it is apparent that, like the clearance (or more accurately, lack of clearance) for the old, non-functioning devices, such clearance for the re-engineered device that actually works has not been obtained.

75.     Recently, and despite claiming in MSS Prospectus I that MSS's "research and development team" (i.e., Jackson), was "experienced in product design, the FDA clearance process and the patent clearance process," Plaintiff and other distributors learned through its own FDA device consultant that the paperwork Jackson claims he submitted to the FDA with regard to the re-engineered device is unlikely to be cleared within the next 6-9 months and there is significant reason to doubt that it will be cleared at all based on the current filing by Jackson. The consultant hired by Evolutions, (another master distributor), further informed Evolutions

20

that there is no 30-day filing or clearance process, which is contrary to representations made by

Jackson.

76.     The consultant has further opined as follows:

> The submission is weak.  The content and structure aren't aligned
> with PMA guidance and best practice for a filing of this
> significance and I think this will be obvious to FDA from the
> outset.  If it gets through the first administrative review, the list of
> deficiencies will be significant and likely insurmountable.  The
> performance data isn't adequate to support the labeled claims…

> The submission is incomplete.  The filing doesn't contain
> documents to support that the product was designed and validated
> in accordance with 21 CFR part 820 . . .

77.     Thus, it is clear that Jackson and others at MSS knew at all times relevant to this

Complaint that the Sharps Terminator did not actually work and that FDA clearance was not

imminent.

78.     In fact, as set forth above, Jackson, Schureck, and MSS continued to claim at all

relevant times that the product was market ready, could be mass produced, and that FDA

clearance was imminent.  Jackson, Schureck, and MSS each knew that these statements were

false and misleading when made, and intended for the Plaintiff to rely upon them in investing in

and deciding to remain as investors in MSS, and in deciding to become distributors for the

Sharps Terminator devices and pay money for distribution territories.

79.     The Plaintiff did, in fact, each rely upon the misrepresentations described above in

deciding to purchase shares in MSS and in deciding to continue to hold his respective shares in

MSS, in deciding to become a distributor for the Sharps Terminator, and in deciding to enter into

a manufacturing agreement with MSS.

### MSS Continues To Solicit Investors Based On False Representations

80.     As recently as October 2012, MSS, through Jackson, solicited and obtained new

21

shareholders by using false and fraudulent misstatements that FDA clearance of the Sharps Terminator would be obtained within 30 days. These statements are false, were false when made, and Jackson knew they were false when he made them and continues to know that they are false.

81.     In addition, as recently as October 2012, MSS, through Jackson, solicited and obtained new shareholders using false and fraudulent statements regarding the capabilities of the Geovolt, which were and are false, were false when made, and Jackson knew they were false when he made them and continues to know that they are false. He makes these statements in conjunction with statements similar to those made to the Plaintiff here – *i.e.*, that MSS had an energy subsidiary or affiliated entity that has rights in and to the Geovolt and the Bi-Metal Generator – and that profits from these inventions would be paid out in some manner for the benefit of investors in MSS.

82.     Worse yet, the Plaintiff recently was informed that MSS, through Jackson and Schureck, among others at MSS, was continuing to sell the old Sharps Terminators (not the re-engineered devices) to potential investor/distributors in order to sell foreign distributorships.

83.     Unless restrained and enjoined from continuing their false and fraudulent scheme in violation of the federal securities laws and their fiduciary duties to MSS, the Defendants will continue to harm MSS and its current and prospective shareholders, including the Plaintiff, through their conduct and cause harm to the value of MSS's shares.

84.     With respect to each of the claims Plaintiff bring derivatively in this action, Evolutions, on behalf of the master distributors association, through counsel, served a demand on each of the members of MSS's board of directors at the address reflected in the records of the Secretary of State of the State of Nevada, each of whom is a defendant in this matter, *via* Federal

Express, overnight delivery, on Monday, November 19, 2012.  A copy of the demand letter sent to each of the board members is attached hereto as Exhibit K.  The board failed to take any action or make any response within the time period allowed in the letter.

**COUNT I**
**FEDERAL SECURITIES FRAUD**
**Violation of Section10(b) of the Securities Exchange Act and Rule 10b-5**
**(by Plaintiffs individually against Defendants Schureck, Jackson, and MSS)**

85.     The Plaintiff restates and realleges Paragraphs 1 through 82 as though fully set forth herein.

86.     As set forth above, Jackson, Schureck, and MSS made false and misleading statements of material fact to the Plaintiff in connection with their respective purchases of MSS shares.  Specifically, they represented that FDA clearance for the Sharps Terminator was "right around the corner," "imminent," "coming in 30-60 days," when they knew those statements were false as set forth in great detail above.

87.     In fact, it appears that at all relevant times, and based on the complete lack of information relating to a FDA filing by MSS or a filing relating to the Sharps Terminator, no FDA filing seeking clearance was ever pending and certainly was never pending in a form that would be imminently approved as the Defendants represented over and over again as detailed above.

88.     MSS, Jackson, and Schureck made false representations regarding FDA approval, the market readiness of the Sharps Terminator, and the capabilities of the Sharps Terminator (including the gauge size it could process) in person and through offering materials (e.g., MSS Prospectus I and MSS Prospectus II), emails, and letters to the Plaintiff as described more fully above in order to induce the Plaintiff and other potential shareholders to rely on them in deciding whether to purchase MSS shares and to induce them to remain as MSS shareholders.  The

Defendants made these misrepresentations of material facts to ensure that MSS continued to receive funds for uses that have never been fully or adequately disclosed.

89.     Indeed, based on Evolution's ability to re-engineer the Sharps Terminator into a commercially viable product by expending $1.5 million, it seems that the millions of dollars MSS has received from its approximately 500 shareholders have been used for improper and fraudulent purposes.

90.     Jackson, Schureck, and MSS acted with scienter because they knew that the above-described misrepresentations were materially false and misleading, knew that such misrepresentations would be disseminated to the investing public (and in fact, were directly responsible for such dissemination), and knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

91.     Jackson, Schureck, and MSS knew at the time they made the false and misleading statements to the Plaintiff and others that they were lying about FDA clearance for the Sharps Terminator, the market readiness of the Sharps Terminator, and the capabilities of the Sharps Terminator (including the gauge size it could process).

92.     From at least the fourth quarter of 2008 through the time of the filing of this Complaint, the Defendants intentionally and fraudulently continued to make these material misrepresentations and actively solicited MSS's stock to be purchased based on those misrepresentations, including by the Plaintiff.

93.     By failing to disclose and continuing to intentionally and fraudulently misrepresent the true status of the FDA clearance process and the commercial viability of the Sharps Terminator, on which material misrepresentations and omissions the Plaintiff reasonably

and justifiably relied in purchasing shares of MSS, the Defendants induced the Plaintiff to purchase MSS shares with substantial sums of money, and induced him to continue to hold those shares and/or purchase additional shares without knowing that those shares were likely worthless.

94.      If the Plaintiff had known the truth regarding the FDA clearance process and the commercial viability of the Sharps Terminator, then he never would have purchased their shares and continued to hold them.

95.      By communicating false and misleading information to the Plaintiff regarding the true status of the FDA clearance process and the commercial viability of the Sharps Terminator as set forth in great detail above, Jackson, Schureck, and MSS participated in a scheme to deceive the Plaintiff, which operated as a fraud and deceit upon the Plaintiff.

96.      The Plaintiff has incurred significant economic loss and damages in connection with their purchases of MSS's shares as a direct and proximate result of the Defendants' intentional and willful actions, including without limitation, damages in the amount he paid for the shares, the amount of money expended to form a distributorship with MSS to sell the southwest territories, and the dividends and/or distributions that were declared but not paid (with the exception of the one-time handwritten check).

**WHEREFORE**, the Plaintiff respectfully requests the Court to enter judgment in their favor on Count I and award the following relief:

      (a)      Injunctive relief as set forth in Count IX;

      (b)      Compensatory damages in an amount to be determined at trial;

      (c)      Punitive damages in an amount to be determined at trial;

      (d)      Attorneys fees and costs;

      (a)      A freeze over each of Jackson's, Schureck's, and MSS's assets to protect

investor funds,

(b)    Appoint a temporary receiver to operate MSS in compliance with all applicable laws, determine all assets and liabilities of the company, obtain FDA clearance for the Sharps Terminator, or alternatively, sell MSS to a purchaser willing and able to undertake such tasks;

(e)    An accounting with respect to all of Jackson's, Schureck's, and MSS's assets, liabilities, books, and records; and

(f)    Such other and further relief as the Court deems just and proper.

## COUNT II
## FEDERAL SECURITIES FRAUD
### Violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5
### (by Plaintiff derivatively against Defendants
### Schureck, Jackson, and nominal Defendant MSS)

97.    The Plaintiff restates and realleges Paragraphs 1 through 82 as though fully set forth herein.

98.    As set forth above, Jackson, Schureck, and MSS made false and misleading statements of material fact to the Plaintiff in connection with their respective purchases of MSS shares.

99.    As recently as October 2012, MSS, through Jackson, solicited and obtained new shareholders by using false and fraudulent misstatements that FDA clearance of the Sharps Terminator would be obtained within 30 days.  These statements are false, were false when made, and Jackson knew they were false when he made them and continues to know that they are false.

100.    MSS, Jackson, and Schureck continue to make false representations regarding FDA clearance – currently claiming that it will be obtained within 30 days, the market readiness of the Sharps Terminator, and the capabilities of the Sharps Terminator (including the gauge size it could process) at least in person and through offering materials (e.g., MSS Prospectus I and MSS Prospectus II) to prospective MSS investors in order to induce them to rely on such

misrepresentations in deciding whether to purchase MSS shares.  The Defendants continue to make these misrepresentations of material facts to ensure that MSS continues to receive funds for uses that are not and have never been fully or adequately disclosed.

101.   In addition, the Plaintiff recently was informed that MSS, through Jackson and Schureck, among others at MSS, was continuing to sell the old Sharps Terminators (not the re-engineered devices) to potential investor/distributors in order to sell foreign distributorships.

102.   Moreover, as recently as October 2012, MSS, through Jackson, solicited and obtained new shareholders using false and fraudulent statements regarding the capabilities of the Geovolt, which were and are false, were false when made, and Jackson knew they were false when he made them and continues to know that they are false.  He makes these statements in conjunction with statements similar to those made to the Plaintiff here – *i.e.*, that MSS had an energy subsidiary or affiliated entity that has rights in and to the Geovolt and the Bi-Metal Generator – and that profits from these inventions would be paid out in some manner for the benefit of investors in MSS.

103.   Jackson, Schureck, and MSS acted with scienter and continue to act with scienter because they knew and know that the misrepresentations they continue to make are materially false and misleading, knew and know that such misrepresentations are being disseminated to the investing public (and in fact, are directly responsible for such dissemination), and knowingly and substantially participate in or acquiesce in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

104.   Jackson, Schureck, and MSS knew and know at the time they made and continue to make these false and misleading statements to the Plaintiff and others that they were and are lying about FDA clearance for the Sharps Terminator, the market readiness of the Sharps

Terminator, and the capabilities of the Sharps Terminator (including the gauge size it could process).

105.    By failing to disclose and continuing to intentionally and fraudulently misrepresent the true status of the FDA clearance process and the commercial viability of the Sharps Terminator, on which material misrepresentations and omissions there is a great likelihood investors will reasonably and justifiably rely in purchasing shares of MSS, the Defendants are inducing those investors to purchase MSS shares with substantial sums of money, and inducing them to continue to hold those shares and/or purchase additional shares without knowing that MSS's shares are likely worthless.

106.    If potential investors knew the truth regarding the FDA clearance process and the commercial viability of the Sharps Terminator, then such information would be material in their decision whether to purchase MSS shares and to continue to hold them.

107.    By continuing to communicate false and misleading information to potential MSS investors regarding the true status of the FDA clearance process and the commercial viability of the Sharps Terminator, Jackson, Schureck, and MSS continue to participate in a scheme to deceive potential investors, which operates and is operating as a fraud and deceit upon those potential investors.

108.    Unless restrained and enjoined from continuing their false and fraudulent scheme in violation of the federal securities laws and their fiduciary duties to MSS, the Defendants will continue to harm MSS through their conduct and cause harm to the value of MSS's shares.

109.    Indeed, as a direct and proximate result of the knowing and intentional violations of the federal securities laws by Jackson and Schureck, MSS and its shareholders, including Plaintiff, have been damaged in numerous ways, including without limitation, through MSS

having a diminished value as a company, through the diminished value of its shares, and through

the increased liabilities to which MSS has been exposed.

**WHEREFORE,** the Plaintiff respectfully requests the Court to enter judgment in their

favor on Count II and award the following relief:

(a)     Preliminary and Permanent injunctive relief as set forth in Count IX;

(b)     Appoint a temporary receiver to operate MSS in compliance with all
applicable laws, determine all assets and liabilities of the company, obtain
FDA clearance for the Sharps Terminator, or alternatively, sell MSS to a
purchaser willing and able to undertake such tasks, so that the Plaintiffs
may be put in the position they would have been had MSS performed
pursuant to the contracts;

(c)     An accounting with respect to all of Jackson's, Schureck's, and MSS's
assets, liabilities, books, and records;

(d)     A freeze over each of Jackson's, Schureck's, and MSS's assets to protect
investor funds;

(e)     Compensatory damages in an amount to be determined at trial, plus
interest, payable from Jackson and Schureck jointly and severally to MSS;

(f)     Punitive damages in an amount to be determined at trial payable from
Jackson and Schureck jointly and severally to MSS; and

(g)     Such other and further relief as the Court deems just and proper.

## COUNT III
### CONTROL PERSON LIABILITY
#### Violation of Section 20(a) of the Securities Exchange Act
#### (by Plaintiff individually against Defendants Schureck and Jackson)

110.   The Plaintiff restates and realleges through 82 as though fully set forth herein.

111.   As set forth above in detail, Jackson was and acted as a controlling person of

MSS, within the meaning of § 20(a) of the Exchange Act.

112.   As set forth above in detail, Schureck was and acted as a controlling person of

MSS within the meaning of § 20(a) of the Exchange Act.

113.   As the inventor of the Sharps Terminator and as the co-founder, Director of

Research & Development, and de facto CEO of MSS, and by virtue of his intimate knowledge of and participation in the details of MSS's operations, MSS's flagship product, the Sharps Terminator, and his involvement in the purported FDA clearance process for the Sharps Terminator, Jackson had the power and influence to control and did influence and control, directly and indirectly, the representations made to the Plaintiff and the other shareholders regarding the true status of the FDA clearance process and the commercial viability of the Sharps Terminator, which the Plaintiff contends were false and misleading.

114.    As a co-founder and the CEO of MSS, and by virtue of his intimate knowledge of and participation in the details of MSS's operations and its flagship product, the Sharps Terminator, Jackson had the power and influence to control and did influence and control, directly and indirectly, the representations made to the Plaintiff and other shareholders regarding the true status of the FDA clearance process and the commercial viability of the Sharps Terminator, which the Plaintiff contends were false and misleading.

115.    Both Jackson and Schureck participated directly in, or were provided with or had unlimited access to all material information regarding the true status of the FDA clearance process and the commercial viability of the Sharps Terminator.  Indeed, both Jackson and Schureck had unlimited access to all material information regarding MSS's operations and the uses to which it was putting funds received from the Plaintiff and other investors.

116.    In addition, because both Jackson and Schureck have direct involvement in the day-to-day operations of MSS, they are presumed to have had the power to control or influence the particular transactions giving rise the securities violations as alleged herein, and exercised the same.

117.    As set forth above, Jackson and Schureck each violated § 10(b) and Rule 10b-5

by their acts and omissions as alleged herein.  By virtue of their controlling positions, Jackson and Schureck are jointly and severally liable to the Plaintiff pursuant to § 20(a) of the Exchange Act.

118.    As a direct and proximate result of Jackson's and Schureck's intentional and willful misconduct, Plaintiff has incurred significant economic loss and damages in connection with their purchases of MSS's shares, including without limitation, damages in the amount he paid for the shares, the amount of money expended to form a distributorship with MSS to sell the southwest territories, and the dividends and/or distributions that were declared but not paid (with the exception of the one-time handwritten check).

119.    **WHEREFORE**, the Plaintiff respectfully requests the Court to enter judgment in their favor on Count III and award the following relief:

(a)    Injunctive relief as set forth in Count IX;

(b)    Compensatory damages in an amount to be determined at trial, plus interest;

(c)    Punitive damages in an amount to be determined at trial;

(d)    Attorneys fees and costs

(c)    A freeze over each of Jackson's, Schureck's, and MSS's assets to protect investor funds,

(d)    Appoint a temporary receiver to operate MSS in compliance with all applicable laws, determine all assets and liabilities of the company, obtain FDA clearance for the Sharps Terminator, or alternatively, sell MSS to a purchaser willing and able to undertake such tasks;

(e)    An accounting with respect to all of Jackson's, Schureck's, and MSS's assets, liabilities, books, and records; and

(f)    Such other and further relief as the Court deems just and proper.

## COUNT IV
## FRAUD
### (by Plaintiff individually against
### Defendants Schureck, Jackson, and MSS)

120.    The Plaintiff restates and realleges Paragraphs 1 through 82 as though fully set forth herein.

121.    As set forth above, Jackson, Schureck, and MSS made false and misleading statements of material fact to the Plaintiff both in connection with their respective purchases of MSS shares and at all times thereafter.  Specifically, they represented that FDA clearance for the Sharps Terminator was "right around the corner," "imminent," "coming in 30-60 days," when they knew those statements were false as set forth in great detail above.

122.    In fact, it appears that at all relevant times, and based on the complete lack of information relating to a FDA filing by MSS or a filing relating to the Sharps Terminator, no FDA filing seeking clearance was ever pending and certainly was never pending in a form that would be imminently approved as the Defendants represented over and over again as detailed above.

123.    As set forth above, MSS, Jackson, and Schureck made false representations regarding FDA approval, the market readiness of the Sharps Terminator, and the capabilities of the Sharps Terminator (including the gauge size it could process) in person and through offering materials (e.g., MSS Prospectus I and MSS Prospectus II), emails, and letters to the Plaintiff as described more fully above in order to induce the Plaintiff and other potential shareholders to rely on them in deciding whether to purchase MSS shares and to induce them to remain as MSS shareholders.  The Defendants made these misrepresentations of material facts to ensure that MSS continued to receive funds for uses that have never been fully or adequately disclosed.

124.    Jackson, Schureck, and MSS knew the statements alleged by the Plaintiff to be

32

false and misleading were false when made.

125.   Jackson, Schureck, and MSS made these false and misleading statements to induce the Plaintiff to purchase MSS's stock, to continue to hold MSS's stock, and to enter into worthless distribution and manufacturing contracts with MSS.

126.   The Plaintiff reasonably and justifiably relied upon the false and misleading statements in deciding to purchase shares MSS.

127.   If the Plaintiff had known the truth regarding the FDA clearance process and the commercial viability of the Sharps Terminator, then he never would have purchased their shares and continued to hold them.

128.   By communicating false and misleading information to the Plaintiff regarding the true status of the FDA clearance process and the commercial viability of the Sharps Terminator as set forth in great detail above, Jackson, Schureck, and MSS participated in a scheme to deceive the market, which operated as a fraud and deceit upon the Plaintiff.

129.   The Plaintiff has incurred significant economic loss and damages in connection with their purchases of MSS's shares as a direct and proximate result of the Defendants' intentional and willful actions, including without limitation, damages in the amount he paid for the shares, the amount of money expended to form a distributorship with MSS to sell the southwest territories, and the dividends and/or distributions that were declared but not paid (with the exception of the one-time handwritten check).

**WHEREFORE**, the Plaintiff respectfully requests the Court to enter judgment in their favor on Count IV and award the following relief:

(a)   Preliminary and Permanent injunctive relief as set forth in Count IX;

(b)   Compensatory damages in an amount to be determined at trial;

(c)   Punitive damages in an amount to be determined at trial;

33

(d)     A freeze over each of Jackson's, Schureck's, and MSS's assets to protect investor funds;

(e)     Appoint a temporary receiver to operate MSS in compliance with all applicable laws, determine all assets and liabilities of the company, obtain FDA clearance for the Sharps Terminator, or alternatively, sell MSS to a purchaser willing and able to undertake such tasks;

(f)     An accounting with respect to all of Jackson's, Schureck's, and MSS's assets, liabilities, books, and records; and

(g)     Such other and further relief as the Court deems just and proper.

### COUNT V
### FRAUDULENT INDUCEMENT
### (by Plaintiff individually against
### Defendants Schureck, Jackson, and MSS)

130.    The Plaintiff restates and realleges Paragraphs 1 through 82 as though fully set forth herein.

131.    As set forth above, MSS, Jackson, and Schureck made false representations regarding FDA approval, the market readiness of the Sharps Terminator, and the capabilities of the Sharps Terminator (including the gauge size it could process) in person and through offering materials (e.g., MSS Prospectus I and MSS Prospectus II), emails, and letters to the Plaintiff as described more fully above in order to induce the Plaintiff to enter into the MDAs and the MLRA, which are worthless distribution and manufacturing contracts.

132.    The Defendants made these misrepresentations of material facts to ensure that MSS continued to receive funds for uses that have never been fully or adequately disclosed.

133.    Specifically, they represented that FDA clearance for the Sharps Terminator was "right around the corner," "imminent," "coming in 30-60 days," when they knew those statements were false as set forth in great detail above.

134.    In fact, it appears that at all relevant times, and based on the complete lack of information relating to a FDA filing by MSS or a filing relating to the Sharps Terminator, no

FDA filing seeking clearance was ever pending and certainly was never pending in a form that would be imminently approved as the Defendants represented over and over again as detailed above.

135.    Jackson, Schureck, and MSS knew the statements alleged by the Plaintiff to be false and misleading were false when made.

136.    The Plaintiff reasonably and justifiably relied upon the false and misleading statements in deciding to enter into the MDAs and the MLRA.

137.    If the Plaintiff had known the truth regarding the FDA clearance process and the commercial viability of the Sharps Terminator, then he never would have entered into the MDAs and the MLRA.

138.    The Plaintiff has incurred significant economic loss and damages in connection with their purchases of MSS's shares as a direct and proximate result of the Defendants' intentional and willful actions, including without limitation, damages in the amount of money they paid MSS in order to enter into the MDAs and the MLRA, and the amount they expended to try to save MSS by re-engineering a commercially viable version of the Sharps Terminator.

**WHEREFORE**, the Plaintiff respectfully requests the Court to enter judgment in their favor on Count V and award the following relief:

(a)     Injunctive relief as set forth in Count IX;

(b)     Compensatory damages in the amount of the dividends that should have been paid to the Plaintiffs, plus interest;

(c)     Punitive damages in an amount to be determined at trial;

(d)     A freeze over each of Jackson's, Schureck's, and MSS's assets to protect investor funds;

(e)     Appoint a temporary receiver to operate MSS in compliance with all applicable laws, determine all assets and liabilities of the company, obtain FDA clearance for the Sharps Terminator, or alternatively, sell MSS to a

purchaser willing and able to undertake such tasks;

(f)     An accounting with respect to all of Jackson's, Schureck's, and MSS's assets, liabilities, books, and records; and

(g)     Such other and further relief as the Court deems just and proper.

## COUNT VI
## BREACH OF CONTRACT
### (by Plaintiff, individually, against MSS)

139.    The Plaintiff restates and realleges Paragraphs 1 through 82 as though fully set forth herein.

140.    After fraudulently inducing Plaintiff to enter into a MDA for the U.S. Southwest region with MSS in connection with the Plaintiffs' investments in MSS, MSS failed to fulfill its obligations under, and breached, that MDA and the MRLA.

141.    Those agreements are valid and enforceable contracts between Plaintiff and MSS.

142.    As stated in paragraph 2 of the MLRA, the MLRA and the MDA, these agreements "are not severable" and must be read together.

143.    Plaintiff fulfilled all of its obligations pursuant to those contracts.

144.    Specifically, pursuant to the MDA for the Southwest, Plaintiff was required to market and sell the Sharps Terminator (MDA – Southwest Region, p. 2).

145.    After paying $37,500 to MSS to enter into the MDA, Plaintiff marketed and obtained orders for the Sharps Terminator within the Southwest Region as required.

146.    In addition, pursuant to paragraph 4(g) of the MRLA, Plaintiff expended approximately $250,000 to make the Sharps Terminator a viable product that worked as marketed.

147.    MSS breached the MDA by breaching the covenant of good faith and fair dealing implicit in every contract by intentionally failing to obtain FDA clearance, a necessary step for

MSS to be able to fill the orders Plaintiff had obtained, and thus, earn the promised commission from such sale.

148.    MSS also has breached the MRLA by breaching the covenant of good faith and fair dealing implicit in every contract by intentionally failing to obtain FDA clearance, a necessary step for Plaintiff to be able to obtain the revenues it expected from entering into that contract and to recoup the monies it expended in making the Sharps Terminator a viable product.

149.    As a direct and proximate result of MSS's breaches, Plaintiff has been damaged in the amount it paid MSS to enter into the MDAs and the MRLA and the amount it expended pursuant to the terms of the MLRA to make the Sharps Terminator a viable product that worked as marketed.

**WHEREFORE**, the Plaintiff respectfully requests the Court to enter judgment in their favor on Count VI and award them the following relief:

(a)    Compensatory damages in an amount to be determined at trial;

(b)    Appoint a temporary receiver to operate MSS in compliance with all applicable laws, determine all assets and liabilities of the company, obtain FDA clearance for the Sharps Terminator, or alternatively, sell MSS to a purchaser willing and able to undertake such tasks, so that the Plaintiffs may be put in the position they would have been had MSS performed pursuant to the contracts;

(c)    Pursuant to paragraph 13(i) of the MLRA, an award of the Plaintiffs' reasonable attorney's fees incurred as a result of MSS's conduct in breaching the contracts as set forth above; and

(d)    Such other and further relief as the Court deems just and proper.

### COUNT VII
### BREACH OF FIDUCIARY DUTY
#### (by Plaintiff derivatively against Defendants Jackson and Schureck and nominal Defendant MSS)

150.    The Plaintiff restates and realleges Paragraphs 1 through 82 as though fully set forth herein.

151.   As co-founders, directors, de facto directors, officers and de facto officers who controlled MSS, both Jackson and Schureck at all times relevant to this Complaint owed a fiduciary duty to MSS and to all of its shareholders, including the Plaintiff, of honesty and good faith, due care, loyalty, and not to engage in self-dealing.

152.   They continue to owe these duties to MSS and its shareholders, including the Plaintiff.

153.   Both Jackson and Schureck participated directly in, or were provided with or had unlimited access to all material information regarding the true status of the FDA clearance process and the commercial viability of the Sharps Terminator.   Indeed, both Jackson and Schureck had unlimited access to all material information regarding MSS's operations and the uses to which it was putting funds received from the Plaintiff and other investors.

154.   Jackson and Schureck directly interacted and communicated with the Plaintiff on numerous occasions regarding those issues.

155.   In addition, because both Jackson and Schureck have direct involvement in the day-to-day operations of MSS, they had and exercised the power to control or influence the particular transactions giving rise the fraudulent acts as alleged herein, and exercised the same.

156.   Both Jackson and Schureck had fiduciary duties to MSS and its shareholders not to disseminate false and misleading information regarding the Sharps Terminator.   They were both also responsible for disclosing all material to MSS's present and future shareholders with respect to their purchases of MSS's stock, the true status of the FDA clearance process, and the commercial viability of the Sharps Terminator.

157.   As set forth above, MSS, Jackson, and Schureck made false representations to MSS's shareholders regarding FDA approval, the market readiness of the Sharps Terminator,

and the capabilities of the Sharps Terminator (including the gauge size it could process) in person and through offering materials (e.g., MSS Prospectus I and MSS Prospectus II), emails, and letters to the Plaintiff as described more fully above.

158.   In intentionally disseminating materially false and misleading information to MSS's shareholders, both Jackson and Schureck breached their fiduciary duties to MSS's shareholders.

159.   In addition, by intentionally refusing to take the appropriate and necessary steps to obtain FDA clearance for the Sharps Terminator – MSS's flagship product and the product from which MSS's shares derive almost all of their value – Jackson and Schureck further breached their fiduciary duties to the company and its shareholders.

160.   As a direct and proximate result of Jackson and Schureck knowingly and intentionally breaching their fiduciary duties, MSS and its shareholders, including Plaintiff, have been damaged in numerous ways, including without limitation, through MSS having a diminished value as a company, through the diminished value of its shares, and through the increased liabilities to which MSS has been exposed.

**WHEREFORE**, the Plaintiff respectfully requests the Court to enter judgment in their favor on Count VII and award the following relief:

(a)     Preliminary and Permanent injunctive relief as set forth in Count IX;

(b)     Appoint a temporary receiver to operate MSS in compliance with all applicable laws, determine all assets and liabilities of the company, obtain FDA clearance for the Sharps Terminator, or alternatively, sell MSS to a purchaser willing and able to undertake such tasks, so that the Plaintiffs may be put in the position they would have been had MSS performed pursuant to the contracts;

(c)     An accounting with respect to all of Jackson's, Schureck's, and MSS's assets, liabilities, books, and records;

(d)     A freeze over each of Jackson's, Schureck's, and MSS's assets to protect

investor funds;

(e)  Compensatory damages in an amount to be determined at trial, plus interest, payable from Jackson and Schureck jointly and severally to MSS;

(f)  Punitive damages in an amount to be determined at trial payable from Jackson and Schureck jointly and severally to MSS; and

(g)  Such other and further relief as the Court deems just and proper.

**COUNT VIII**
**<u>UNJUST ENRICHMENT</u>**
(in the alternative)
**(by Plaintiff individually against Defendants Jackson, Schureck, and MSS)**

161.  The Plaintiff restates and realleges Paragraphs 1 through 82 as though fully set forth herein.

162.  Through the Defendants' misconduct as detailed above, they have wrongfully retained a benefit in the form of funds from the Plaintiff's investments.

163.  The Defendants intentionally and willfully issued offering materials and other communications to the Plaintiff that contained information that was known to them when communicated to be materially false and misleading to induce the Plaintiff to invest in MSS.

164.  The Defendants' retention of the aforementioned benefits under the fraudulent circumstances described in great detail through this Complaint, while at the same time depriving the Plaintiff of those benefits, violates fundamental principles of justice, equity, and good conscience.

**WHEREFORE**, the Plaintiff respectfully requests the Court to enter judgment in their favor on Count VII and award the following relief:

(a)  Injunctive relief as set forth in Count IX;

(b)  Compensatory damages in the amount of the Plaintiffs' respective investments, with interest;

(c)  Punitive damages in an amount to be determined at trial;

40

(d)    A freeze over each of Jackson's, Schureck's, and MSS's assets to protect investor funds;

(e)    Appoint a temporary receiver to operate MSS in compliance with all applicable laws, determine all assets and liabilities of the company, obtain FDA clearance for the Sharps Terminator, or alternatively, sell MSS to a purchaser willing and able to undertake such tasks;

(f)    An accounting with respect to all of Jackson's, Schureck's, and MSS's assets, liabilities, books, and records; and

(g)    Such other and further relief as the Court deems just and proper.

### COUNT IX
### PRELIMINARY AND AND PERMANENT INJUNCTIVE RELIEF
**(by Plaintiff derivatively against Defendants
Schureck and Jackson and Nominal Defendant MSS)**

165.    The Plaintiff restates and realleges Paragraphs 1 through 162 derivative counts as though fully set forth herein.

166.    MSS and its shareholders have a clearly ascertainable and protectable right to ensure (a) that the value of MSS's shares is not impaired through the conduct of MSS's directors, officers, representatives, and employees of the company, which as demonstrated above, has been and continues to be both fraudulent and in derogation of their fiduciary duties to MSS and its shareholders and (b) that the conduct of MSS's directors, officers, representatives, and employees of the company do not continue to create significant potential for MSS to incur, or at least have to defend against, legal liabilities.

167.    Plaintiff, derivatively on behalf of MSS, have a strong likelihood of prevailing on the merits of their derivative and other claims, including those set forth in Counts I through IX, which entitle Plaintiff to injunctive relief.

168.    Jackson's past criminal and SEC disciplinary history involving securities fraud and dishonesty makes the need for immediate injunctive relief due to the potential for imminent harm to MSS, its shares, and its shareholders even more apparent and appropriate.

169.    The remedy at law for MSS and its shareholders is inadequate, and they will suffer irreparable harm if injunctive relief is not granted, because, among other things, they do not have the ability to stop Jackson and Schureck from (a) harming the value of MSS's shares through fraudulent and other conduct, (b) wasting MSS's assets by using MSS's operating funds for improper purposes, and (c) continuing to act in ways that may cause MSS to incur significant legal liabilities.

**WHEREFORE**, the Plaintiff respectfully requests the Court to enter judgment in their favor on Count IX and award the following relief:

(e)    A preliminary and permanent injunction to:

(i)    Restrain and enjoin Jackson, Schureck, and MSS from violating the federal securities laws;

(ii)    Restrain and enjoin Jackson and Schureck from breaching their fiduciary duties to MSS as set forth herein;

(f)    A freeze over each of Jackson's, Schureck's, and MSS's assets to protect investor funds,

(g)    Appoint a temporary receiver to operate MSS in compliance with all applicable laws, determine all assets and liabilities of the company, obtain FDA clearance for the Sharps Terminator, or alternatively, sell MSS to a purchaser willing and able to undertake such tasks;

(h)    An accounting with respect to all of Jackson's, Schureck's, and MSS's assets, liabilities, books, and records; and

(i)    Such other and further relief as the Court deems just and proper.

## JURY DEMAND
### (all claims)

The Plaintiff demands trial by jury on all the claims for damages.

Dated:  November 28 2012                   Respectfully submitted,

                                           HAMID HEKMATIAN

                                   By:  /s/
                                           Hamid Hekmatian, Pro se.

HAMID HEKMATIAN
7250 E. PARADISE DR.
SCOTTSDALE, AZ 85260
(480) 371 – 8852


### Exhibit List

| Exhibit | Description |
|---------|-------------|
| A | MSS Prospectus I |
| B | MSS Prospectus II |
| C | MDA – Southwest Region |
| D | MDA + Subcontractor Agreement |
| E | MSS Organized Diagram |
| F | November 10th letter |
| G | January 24th, 2012 letter |
| H | November 17th email |
| I | October 23rd FDA letter |
| J | MSS tax returns |
| K | Letter from Mr. Tomlinson (attorney for Evolutions) to board, making demand |
| L | Correspondence between Hamid and Ken regarding purchase of stock |